United States v. Nucera. Thank you. Okay. Switch tables. Thank you. Appreciate it. Council you may proceed. Thank you your honor. May it please the court, Ms. Calazzoli, my name is Rocco Ciperone and I represent appellant Frank Nucera Jr. Your honors, unless the court has a preference, I intend to start with the rule 606, jury unanimity issue, jury issue. Please go ahead. Thank you your honors. The district court erred respectfully by denying the new trial motion and denying an evidentiary hearing in this matter. There were really three things emerged from what we know from the post-trial record, and that is that there was improper juror bias, that there was a juror who testified falsely during voir dire, and that there was other juror misconduct, which is corroborative, admittedly not related to count three, but I think corroborates some of the mishaps in the jury room. Let's go ahead and start with 606. So is Judge Kugler wrong that, you know, we can't be looking at jurors who come out after the fact and say it's all messed up, shouldn't happen? Excuse me, is it clear that Judge Kugler was not notified that there was a problem in the jury until after the jury was discharged? It is clear that he, in fact, was aware prior to the jury discharge that there were issues brewing in that jury room, and I think, Judge Jordan, to answer your question as well, that that's the rub here, that the veil provided by Rule 606 in the case law presumes that the safeguards that are in place at trial would be adhered to so that we don't have to go back and attack a jury verdict and the integrity of the jury verdict, but here those particular protections were not adhered to because there were two opportunities that were presented to Judge Kugler where Juror Viscomi, as referenced in her affidavit, approached the court, expressed the concerns, and that was never brought to the attention of the parties. Well, when you say approached the court, she approached the court clerk who told her to write a note, and in one instance she didn't, right? And in the other, the character of communication to the extent it got to Judge Kugler let him know that things were getting heated, but is there any record evidence that he knew there were racially charged statements being made in the jury room? My recollection of her affidavit is that she did reference that in one of the two interactions, and in the second one she wasn't sure, but she thought she might have even referenced that there were threats in that regard being made in the jury room, and it's certainly clear that at least the second communication got to Judge Kugler because he then went into the jury room and made, and this is paraphrased, the speech that said not to let your personal... Right, but there's not a... I'll ask you to show it to us or direct us to it, where any juror said, hey, we've got jurors in here who are making this all about race and telling us we're racist if we don't convict. That was not, that information didn't get to Judge Kugler, did it? I think that's fair to say it did not get to Judge Kugler. She attempted to get that information. As she indicated in her affidavit, this is Juror Viscone, indicated in her affidavit that she felt daunted and intimidated enough by the other jurors that she did not want to write a note because the foreperson would read every note, and she was not comfortable doing that because of what was going on in the jury room. So I think, and no disrespect to Judge Kugler whatsoever, I respect him immensely, but he should have brought that to the attention of the parties and we could have maybe ferreted out additional inquiry, which did have an impact on the jury, as we now know from the affidavits. And we know there were multiple Allen or dynamite charges, euphemistically called, that defense counsel, and it wasn't me, I don't mean to speak in the third person, would have been able to use to say we can't keep sending this jury back to essentially compel a verdict in this scenario, which that information was not available to the parties. So the parties, unlike in the Scarfo case where Your Honor more recently addressed an issue, never had an opportunity to address this. That's the problem here. Rule 606 presumes that those safeguards that are in place at trial would be followed, and they were not followed here, and the veil of Rule 606, therefore, should not apply here because we don't have the integrity of the jury verdict, and in a situation where that preferred methodology, as Your Honor indicated in the Scarfo opinion, should happen, district judges should bring contact about the substantive deliberations to the attention of the parties. It did not happen here, and there were two opportunities for that to happen, or at least for Judge Kugler to inquire further and to let the parties know that was going on. Mr. Cipron, is there a difference between jurors looking at the evidence through the lens of race versus a juror saying, I don't care, this guy is white, and I'm voting to guilt because this guy is white, which is like a Pena Rodriguez, except in a clear statement that that's why I'm voting guilty. Is there a difference between that? Because Judge Kugler, in your request in your hearing, requesting a hearing, seemed to believe that, listen, these jurors are looking at this through the lens of race because that's what they do. And this case was about race. They bring their experiences into the jury room, whether we like it or not. And she heard all these horrendous statements by this official, and she and her jury voir dire, she was asked about what about racial epithets, and she said that's the hardest part. But she clearly was going through that. So how do you draw the distinction between the permissible view of evidence from a racially informed standpoint versus a clear statement that that's why she's voting for guilt? There is a difference, Your Honor. It's a difference along the spectrum. But the latter situation that existed here I still think is problematic when you look at what else was occurring in the jury room and what happened during voir dire, where Juror Richardson masked, to put it kindly, her inherently held and deeply held biases. She brought those to bear upon the other jurors, and we clearly know from the affidavits that it had an impact on those jurors because even most markedly, I would say, Juror McCluskey said that it made him feel the need to make reparations and to make things right for even his own past transgressions. I don't remember the exact terminology. But that does happen in jury deliberations. They have strongly held views based upon their life experiences. But don't we under Peña Rodriguez have to say, was there a clear statement by Richardson that she was going to convict this guy because he was white, and that white people do? Under the strict exception in Peña Rodriguez, without extension of it, yes, candidly, probably so. But I respectfully think that this Court should consider, especially where the protections of that veil are not followed and are not present here, when you combine the misrepresentations that are set out in Appellant's brief regarding voir dire, along with what's clearly apparent from those juror affidavits, and importantly also the inquiry. Judge Kugler didn't find there were misrepresentations. She struggled in voir dire. He acknowledged that. She was having trouble with it. But he reasoned that once she heard these horrible things being said, you know, I wish a dog would attack these people. I mean, just once she heard that, then, you know, it was the hardest part for us. I agree that that's how Judge Kugler viewed it, Your Honor. But I think when you look at the context of all of her answers, they were misleading. The easiest one, I think, or one easy example, is what was question 74 in the questionnaire that asked the jurors and Ms. Richardson, have you or anyone close to you ever been the victim of discrimination? And her clear, unequivocal response was no. Yet she got into the jury room and said, when I grew up in the South, I had to sadly, you know, use segregated bathrooms, urinate on the side of the road in a mason jar, and suffered discrimination. And so that's clearly inconsistent with her unequivocal no to that question, for example. So how do we get around the voir dire case, Judge Sotomayor's case, that you really cannot use affidavits? The way, you know, you want them to be used here. The, again, the voir dire case was a situation, unlike this one, Your Honor, where these issues came to light only after the verdict was rendered. But here they came to light previously to the district court that should have pursued further inquiry. It should have at least brought that to the attention of the parties to allow the respective parties to have input as to how to address those issues. So I think that's an important distinction from the voir dire case and the other cases, where these issues typically only arose after the jury verdict. And no one, including the court, had any awareness that there were concerns and issues brewing to the point where jurors were crying, jurors were needing breaks. And, again, that may happen in cases, I understand that, but where a juror twice put herself out to ask for the court's intervention, essentially it was a plea for help. Is there a difference between the juror affidavits and the Philadelphia Inquirer interview? Is there a legal difference between the attack rendered by the affidavits and the public statements of Juror Richardson? I do think there is a difference, Your Honor. And that Inquirer article was, it's the same in the sense that it's a juror voluntarily coming forward, but in this particular situation it's Juror Richardson coming forth about her own story. She told the story she regaled the jury with that are inconsistent with her voir dire responses. And to the extent that one of the underpinnings of Rule 606 is to safeguard the jurors from harassment, for example, that doesn't exist here. She put herself out there in that Inquirer article. She had no qualms about doing that and did it very quickly after the verdict. So you think it's consistent with the language of 606 to say, okay, well, we may not be able to look at the affidavits, but we can look at the Inquirer article? I do, Your Honor. I would respectfully ask the court to look at the affidavits for the reasons, but as well, independent of that, yes, I think you can still look at and the district court could have and should have looked at the Inquirer article as a basis to challenge what happened here and to grant at least an evidentiary hearing, if not grant the motion itself. This is an unusual circumstance, at least in my experience, and sadly I'm getting much older. It's now 34 years since I've been trying cases, and five jurors, essentially, if you count Richardson, have come forward and addressed aspects of the jury verdict that are very, very troublesome. Let's turn for a minute to your Rule 807 argument. 807 is pinned on there not being any other evidence that a proponent can obtain through reasonable efforts, right? Stroy is clearly available to you. I'm just having a hard time understanding your argument. Maybe I'm not getting it, but since he's there and he's clearly available and you could get him to say what you want him to say, I mean, I understand all the reasons why you wouldn't want him on the stand, but how can you square your argument that there was a violation of your right to get this in under 807 with the availability of Stroy to testify, if I'm saying the gentleman's name correctly? I believe that's correct, Your Honor. I don't interpret Rule 807 as having a requirement that he be unavailable, although it's a factor. I'm just reading it to you. I've just read it to you. It's got to be more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts. Clearly, Stroy's statements about what he saw and what occurred are more probative than the hearsay statements of what Stroy said. So help me square the circle here. How can you get past that? So it was probative on, in particular, as Judge Cougar found in some respects, he kind of split the ruling in a sense. It was probative of the point it was being used for. It was probative of the FBI agent's less than thorough investigation. And so Judge Cougar allowed questioning about... I understand all that. I understand your argument about, you know, Judge Cougar giving us some but not giving us all, and they took unfair advantage of that, et cetera. I'm just asking you to focus on this one point, because I don't understand, candidly, I don't understand your argument. If you've got the witness and the witness is available, how can that not be more probative than hearsay evidence about what that same witness said? Well, if you're talking about in terms of the substantive truth of the matter asserted, I'd have to agree with Your Honor that that's certainly more probative. Well, that's the whole point of what you were offering. You wanted to get in front of the jury, look, this guy, the victim, was not pointing at Mr. Nussera. So don't believe it was Nussera. You know, you could say, and they should have investigated more, but and they should have investigated more is pinned on the truth of his statement that he didn't know or he didn't see or it was somebody else, right? I wouldn't say it's necessarily, in part, yes, but I wouldn't say it's necessarily pinned on the truth, meaning if the FBI agent is hearing the best positioned person to know who struck him, how he struck him, and where they struck him, to then simply not go down any further path than looking at Mr. Nussera as the target is problematic, and it's an issue the jury should have been able to represent it with, with the material fact, the very material fact that it was the alleged victim who made that statement. Okay. But I understand Your Honor's Rule 8 of 7 questions as well. I hope I tried to answer it the best I could. I understand your statement. Thanks. Thank you, Your Honor. Can we talk about the cross reference aspect? Go ahead, Judge. Well, I'm just concerned that you say the court improperly cross referenced another provision in actually looking at and incorporating into it the civil rights aspect. We have Application Note 17 that would require that the other offense be a fraudulent offense of a similar nature, if you will. But I'm just wondering what weight we give that after the Supreme Court ruling in Keysore and our ruling in Adair where you can't just use those notes and defer to them as we did in Stinson. You need to go through an inquiry as to whether there's an ambiguity, et cetera, et cetera. So I guess my question is how do you give the application notes the very strong weight that you give them? Your Honor, I think they're still very instructive. I understand the recent case law in that respect that says that they don't have the force of law, of course, and they're not at all binding, and it's really statutory construction that controls. So I do understand that they're less weighty now in light of that case law than they were before, but they are still instructive as to what the advisory committee's intention was in drafting that. There's nothing to the contrary that suggests that it wasn't limited to that circumstance. But also importantly, there are other reasons that those cross-references don't apply. For example, the lack of obstruction of a governmental function. There is nothing in the record to support that anything about Mr. Nussera's false statements of which he was convicted, again, notwithstanding the issue of which one the jury found unanimously, which is another issue in the brief, but under 5K2.7, a governmental function must have been significantly or substantially disrupted. So even if you don't put a lot of stock in that application, though, there is nothing in the record to support any disruption of a governmental function. No rabbit holes. The FBI went down, as we know, consistent with my Rule 807 argument. They didn't really pursue any other investigative aspects based on those alleged false statements or a convicted false statement. So even notwithstanding that application, though, I think there's grounds that the guidelines were misapplied. Okay. I'm curious as to why we have three circuits who have looked at this cross-reference provision and haven't talked about the application, though. Genoa, Garcia, and Barr, do you have any thoughts as to why they might have not relied on it and to query whether they actually did look to make sure that there was a fraudulent requirement or similar requirement? I don't have any particular insight into that, Your Honor. It's missing from the opinions, and that's the extent of my awareness. Okay. All right. Thanks, Mr. Cipriano. Thank you, Your Honors. Had you reserved time for rebuttal? I didn't even notice. I neglected to. I did mention it to the clerk. I neglected to mention it to Your Honor, so I assumed. Great. Thank you. I appreciate that. Then we'll have you back on rebuttal, and we'll hear from the government. Good morning, Your Honors. I'm Assistant United States Attorney Sabrina Camazoli, and I represent the government, the appellee, in this matter. I'd like to begin, unless Your Honors have questions, immediately by addressing the very first question or the very first concern that I think was raised both by Judge Jordan and Judge Sirica, and that is Judge Kugler's intervention with the jury, whether it ought to have done before, whether there was any opportunity to have done that before, and whether it was problematic that he did so without telling the parties. Yeah. I'm interested in your view as exactly what the clerk was told. Yes, Your Honor. What the clerk did and when. And I do have a chronology for you, and I do have some page references to the record, if that would be of help. So the first thing that happens, according to Juror No. 2, and this is from pages of the Defendant's Appendix 197 to 199, and then Judge Kugler's recollection is the Supplemental Appendix 1365 to 1372. If you put both of those together, you sort of get a timeline of what happened. Juror No. 2, before the verdict is returned on Count 3, alerts the deputy clerk that things are going on in deliberations and some jurors are calling other jurors racist. The deputy clerk says, if this happens again, please write a note. Juror No. 2 does not write a note. Hold on. Yes, Your Honor. Is that statement to the court clerk legally significant? In other words, should the government be taken to have the government, should the court be taken to be on notice when a juror says to somebody in authority, who is the interaction, the person with whom the jurors are interacting, there's a problem in here and it's racial. There's racist stuff going on here. In other words, does it matter that if the information didn't get to Judge Kugler himself, if it got to the court in the person of the court clerk? I can only speculate what the court clerk was thinking at the moment, but perhaps he or she. That's not what I'm asking, and I want to redirect you. I don't even care what the court clerk was asking. I'm trying to find out as a point of legal significance, once the juror tells an authority figure within the court system, this is a problem, it's racial, does the fact that it didn't get to the judge make any difference if the juror has made the effort to put the court on notice? Do you understand what I'm trying to get at? I do understand what you're asking, Your Honor, and I don't think it was incumbent upon the clerk to alert the judge or the court's fault that this didn't happen, because the clerk said very specifically to juror number two, if you're having this problem, please put it in writing. And juror number two did not. If the juror doesn't write the note, if the juror had said, they're threatening to kill me if I don't convict, and he says, write it down, and they don't do it, your position, the government's position is, that doesn't matter because they should have written a note. No, Your Honor, I think if there were threats of physical violence, the deputy should have immediately alerted the marshals or the court security officers. So it's the kind of assertion that's made that matters, whether it gets past the court clerk or not, or is the fact that the court is put on notice, or is the court put on notice because the juror says to the authority figure interacting with them, there's racial stuff going on in this room. Perhaps that wasn't sufficient notice, because there was no description as far as we can tell of what that really means. And perhaps if the juror had put it in a note, well, we know that note would have gone directly to the court. And the court would have directed it. We also know that it would have been read by the foreperson and perhaps communicated to the rest of the jurors. And so a reasonable person fearing for, maybe even fearing for their personal safety, given that Juror Richardson was saying, if I had a gun, I'd shoot you. Maybe, no, that's not enough? Your Honor, the juror number two says that she didn't want to put it in a note that the foreperson could read. She could have asked for an envelope to seal it. We know that another note did make it to the judge. That was sealed in an envelope that the other jurors did not see, and that was a personal note by one of the jurors who sought counseling. I believe there are ways that this juror, if she had been so disturbed, could have alerted the judge by asking the deputy, please alert the judge. The juror was clearly disturbed, right? The juror was clearly disturbed and troubled. I don't even think that's disputable on this record. The question we've got to wrestle with, and I think I'm hearing the government say, it's really on the juror. If the juror really wants to get this through, the juror will find a way to get it through. And since the juror really didn't push that hard, it couldn't have been that big a deal. Am I reading you right? Well, I'm not sure what the impact of her statement was on the deputy clerk. I really don't know. But I would say the comment that Juror Richardson is alleged to have made, which is, if I hear one more person say they have a black friend, I'm going to shoot you all, that was actually not made until after this interaction. That was not made until after the verdict was returned on count three.  The second time, Juror No. 2 alerts, actually not the deputy clerk, but a court security officer who tells the deputy clerk who tells the judge, and the judge comes into the jury room. That happened after the verdict was taken on count three. And that matters. It does matter, Your Honor, under Scarfo. The jury hasn't been discharged at that point. That's correct, Your Honor. And so if the jury verdict were tainted by racial animus, it could have been addressed at that point, right? But the only thing that happened after that, Your Honor, was they deadlocked on two counts, and those counts were ultimately dismissed. My question to you is, if the court had learned about, I mean, right now we're not fighting about whether there was racial animus in the jury room. Right now, our discussion is about whether or not the judge should have done something about it, had he known. And with the jury not being discharged at that point, does that support Mr. Ciperone's assertion that it could have been addressed, and it would have been addressed without it being a 606 violation, because the jury was still present, and it would not have been a 606 violation? So is that accurate or not accurate? Or would you still say, oh, no, it's 606 because they'd returned that verdict? I would defer to Judge Kugler's view of what was going on in the jury room, which is that things were very heated, and things were very tense. And as someone who's been on the bench for 20 years and had numerous cases before him, this happens. This happens in jury deliberations. He was not surprised, and nobody told him there were any allegations of threats being made. It's common for a juror to say, all you white people, or you're racist, if you tell me you've got a black friend that'd like to shoot you. You can just, or those, that's, maybe I'm misunderstanding you. Are you suggesting that if we accept at face value, if we read those affidavits and believed them, that this is just run-of-the-mill heated courtroom talk and not racially charged animus? I don't think there was any part of this case that was run-of-the-mill, Your Honor, if I could answer it that way. This was a very unique case. Don't answer it that way. Answer specifically, because what you just seem to be saying is, Judge Kugler, because this was just, he went in and he dealt with it and said it's heated. But this wasn't just heated. According to these jurors, it was racially charged. If we flip the script here and the things were being said about a black defendant, would this conversation be different? Well, Your Honor, we can flip the switch and we can look at case law where that has actually happened, such as in the Robinson case, where the Sixth Circuit found that racial animus by the white jury foreperson against two of her African-American colleagues on the jury was not enough racial animus against the black defendants to allow any further inquiry under Rule 606B. So I think what we really have to do is get back to whether the statements that are alleged to have been made. So those are the facts. That was an application of 606. That was not a statement that that was not racial animus that would be troubling and difficult. So maybe you should go to Pena-Rodriguez, actually, and tell us why you think Pena-Rodriguez just doesn't apply. Pena-Rodriguez is very specific and very narrow, as this Court is aware. I could only find one other federal appellate case which actually allowed for an evidentiary hearing on Pena-Rodriguez grounds. It has been interpreted narrowly. I actually haven't found any federal appellate case in which the narrow exception has been expanded to a situation like this, which is exactly what the defendant is asking this Court to do. In that case, the Supreme Court said that there must be evidence that the juror has made a clear statement that indicates she relied on racial stereotypes or animus to convict the defendant. Not every offhand comment will suffice. And there must be a showing that at least one juror made a statement exhibiting overt racial bias and racial animus was a significant motivating factor to convict. And that is a very high burden. Okay. Now, let's start with the Philadelphia Inquirer's statement where she says, you just have to believe if a person has said racial things that they would act, that they're guilty. I would like to address that, Your Honor, because I disagree that the Inquirer article can be viewed any differently from the affidavits under 606. We'll get to that. We'll get to that. Yes. Answer my question. I will. In the context of the Inquirer article, she talks about her own juror statements, incidents that happened in the jury room, statements by other jurors, and her own mental thought processes. Where she says, you just have to believe he's guilty. You just have to believe it because he said those things. No, Your Honor. Her mental processes in that section of the Inquirer article is after she heard the evidence in the case, which included a tape recording of the defendant saying, within an hour of allegedly assaulting the black teenager, that he would have liked to have sicced canines on the two black teenagers. After hearing that evidence, she said, you have to assume someone who says that is going to, you know, be prone to acting violently. And that was her own mental thought processes during deliberations after hearing the evidence. And I don't see how under Rule 606B that can be inquired into in an evidentiary hearing. It also does not contradict what she said during voir dire. Well, address Mr. Ciperon's 606 argument that 606 is meant to protect jurors from being questioned. She doesn't need to be protected. She came out in public and said to the newspaper, you've got to assume this guy's guilty because of the stuff he said. Your Honor, 606B does not have a she put herself out there exception. And although the policy reasons behind 606B in part are to protect jurors from harassment, the big policy reason behind it is to protect the finality of verdicts. Pena Rodriguez sort of punches a hole in that, doesn't it? A very narrow hole, Your Honor. And the very narrow hole is if you can say this juror, this jury was tainted with racial animus, then you can look at the juror affidavits. Assume for the sake of discussion, and it is just an assumption, assume for the sake of discussion that two or three of us thought, well, it certainly looks like there was racial animus here, and it certainly looks like there was an effort on behalf of some juror to get this information to Judge Kugler. And it certainly looks from the statements in the affidavits that there was racial animus motivating a verdict here. If we thought that, would that meet the Pena Rodriguez? I think the question is, what is the evidence of racial animus? And is it one black juror, or perhaps more than one black juror, impugning three white jurors and claiming that they're racist because they don't see the evidence the way she does? Is that evidence of serious racial bias against the defendant? Is it racial bias against white people? Because she's saying, as a black woman, I see the evidence differently than the white jurors seem to see it? Was that all she said? I'm a black woman, and I see it differently? Or did she say, in effect, if you don't see it the way I do, you are a racist? Even if she did. This white person needs to be convicted, and needs to be convicted because if he's not, it runs against everything I know. And if you don't see it like I do, yeah, you're a racist, and I'd actually like to shoot you. If she is saying, in those words, I think you're racist if you don't convict, that is not evidence of her own racial animus against white people, or her racial animus against the defendant that significantly motivated her vote. Okay. Gotcha. However, Your Honor, I would just say, if I may, Your Honor, if this Court believed this fell within the exception of Pena-Rodriguez, the appropriate remedy would be a remand for an evidentiary hearing, and not a new trial, so that Judge Kugler could flesh this out, and the parties would have an opportunity to brief whether this had a significant impact on the verdict. Understood. Thank you. Judge Rendell? I was going to ask for you to address the cross-reference aspect, just so we don't lose that. I would be happy to, Your Honor, and first of all, I think you're absolutely correct. Application Note 17 has not been considered, was not considered by Judge Kugler, and has not been considered by the other few courts that have addressed this issue, because there is no reason to. As Judge Kugler found, the guideline itself is unambiguous, and under Kaiser there is absolutely no need to, and he did so on pages 33 and 38 of the defendant's appendix. He found this is an unambiguous guideline. There is no reason to look at Application Note 17. But how about the fact that there is no obstruction, as your colleague would say, that the conduct really didn't fit the other guideline? I'm sorry. I might not be understanding the question. Okay. Mr. Ciccarone said, well, it doesn't fit the cross-referenced guideline, because the conduct alleged does not include obstruction of justice. I understand what you're saying, Your Honor, now. So not all of the elements of the other provision are in the conduct. That's correct, Your Honor, but the guideline does not tell the court to look at the elements of the other count. It tells the court to look at the conduct alleged in the indictment on the count of conviction to see if that conduct, if proven, could prove the other count. So if you look only at count 3 of the indictment, you see, first of all, it incorporates by reference paragraphs 1 through 9 of the indictment where all of the conduct is alleged. And furthermore, count 3 of the indictment itself alleges certain conduct that would meet the elements of 242. That's all that is necessary for the court to apply the cross-reference. The court need not find that the elements of the 242 crime are actually listed in the indictment under the false statements count. All right. Thank you. You're welcome. Okay. Are there any further questions? No, thanks very much. Thank you very much, Your Honor. Thank you. We'll hear from Mr. Cipriano on rebuttal. Thank you, Your Honor. A couple of quick points in kind of random order in the nature of rebuttal. Just to correct, Ms. Comisole said that if Judge Cooler told Ms. Viscomi, if you're having a problem, put it in writing, that's not what he said. What the deputy clerk said was if it continues, put it in writing. We know she was already having a problem, and we know it did continue. Ms. Comisole referenced that the government's not sure what impact the inquiries or comments that the deputy clerk made on the deputy clerk, but an evidentiary hearing would have cured that. We could have theoretically inquired of the deputy clerk, and certainly the jurors have, again, approached an authority, as Your Honor was at least questioning about, to put somebody on notice who is in a position of authority, and that was their point of interaction throughout the trial. If at a hearing it's determined that the clerk or the court knew or should have known, what does that do to the overall result in this case? Well, I think, again, the crux becomes, in part, Your Honor, importantly, that the parties were not notified. And if we just look at a simple example of the Allen charge, the dynamite charge, I would have certainly, as a litigant, pressed the court to not continue urging and sending the jurors back to deliberate in that powder keg with improper influences happening. So what does that do? Does that require a new trial, if that's the case? Isn't Rule 606 pretty much, regardless of what happened in the trial, isn't 606 the ultimate authority once there's been a verdict? I do believe it will require a new trial, yes. I do think it would require a new trial. And, yes, Rule 606 is the ultimate authority, assuming, I would say, that those safeguards that are in place were engaged. Because if not, we're then having talismanic adherence to a rule that, in this situation, I would submit undermines confidence in the outcome. The point behind 606 is to foster confidence and preserve confidence in jury verdicts. Once there is a verdict, what can, what could have or should have happened during the trial, what can that bring to bear on the result? Isn't 606, you know, is there anything else? Is this structural error? What case says, oh, well, we've got a verdict, but, you know, earlier on the court should have done something. What case law says you've got a new trial if that's the case? Well, I would say that Pena Rodriguez supports that, because the jury verdict was infected by what was occurring in that jury room that was improper. But you will agree, won't you, that the verdict is the key? It's not what the court should or could have or would have done earlier on. Oh, I agree. No, essentially, I am attacking the verdict here. Correct. I agree with Your Honor. Yes, I do agree, Your Honor. Well, your assertion is that, now I'm not sure I understand. I thought your argument was we at least deserve the hearing where these things could be aired, because it's conceivable that at that hearing where these things are aired and 606 isn't blocking the court from hearing this evidence, the court, the district court itself might decide this was infected with racial animus and therefore a new trial. Did I not? No, you have that correct, Your Honor. So I was kind of getting to the ultimate point of what the basis for the motion was. You'd be arguing for a new trial. Correct. But it would be up to the district court to decide whether or not, now taking this information into account, which is not blocked by 606 at that point, because the judge has decided, either we've decided, well, it would be we've decided, hey, the prime facial case was made, you needed to have a hearing. The judge would hear this, and then the judge would decide. Judge Cougar would say, yeah, racial animus, new trial. Or the judge would say, I don't think so. I don't think this was a substantial motivating factor. You're done. Is that right? Correct. And that's when I think I'm often more articulate on paper than I am on my feet, Judge. But, yes, and you were certainly more articulate. That is correct. That is my argument that the defendant shouldn't, the appellant should have had an opportunity to have that hearing before Judge Cougar, so Judge Cougar could have made that in less of a vacuum with consideration of the affidavits, any juror testimony, et cetera. Okay. May I make just a few other quick comments? Well, I'm not sure. Judge Rendell, did you have a follow-up on that? No. I think that makes it clear that you are focusing on the verdict. You're not saying Cougar or the court clerk should have done something in the beginning, because once there's a verdict, that's off the table. Once there's a verdict, we need to go to Pena-Rodriguez and figure that out, and the hearing would be focused on Pena-Rodriguez, not on the court saying, well, maybe I should have done something earlier. Correct? Correct, in the sense that, yes, that would be the ultimate argument that the biases infected the jury verdict. Correct. Exactly. Yeah. Okay. But I put forth that I have the appellant establish a prima facie case, too. Got you. I understand, Judge Rendell. Go ahead. Give you a minute to wrap up. Thank you, Your Honor. The government says only one thing happened after these notes were passed, and that's that the jury deadlocked on two counts. But that ignores, again, that there could have been infection of that count three verdict, and I think the affidavits make clear it was infected by what was going on in the jury room. To talk about the issue of the statement that Your Honor was questioning the government about, whether Ms. Richardson's statement to the inquirer, where you would have to assume that somebody made that. I, during voir dire, asked her very pointedly the following question. If you heard in follow-up to question 89, if you heard evidence that he, meaning Mr. Nussera, used the N-word and he used it on different occasions at different times, would that lead you to at least even ever so slightly have some checkmark against him about whether he would act in a certain way, for example, in a manner aggressively toward an African-American which he is accused of? And she resoundingly answered no. Her statement to the inquirer, which is extrajudicial, is not testimonial about what happened in the jury room, said if you heard language like that, you have to assume he would strike somebody. So that's directly inconsistent with her answer, Your Honor, and I do think that's outside the scope of Rule 606 because it's her statement to the inquirer. And, Your Honor, the only other point I'd make is with respect to the guideline analysis, the conduct alleged in indictment count three included no reference to the required element for section 249 that the alleged victim suffered any injury. Beyond that, Your Honor, I don't have an answer for the question, but I appreciate the additional time you gave. Okay. Well, we thank counsel for argument. It's been helpful. We've got the matter under advisement.